IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA

Plaintiff

vs                                              CRIMINAL 07-0111CCC

**1) BEPSY O. AGUASVIVAS-
CASTILLO**,
2) ROBIN A. AGUASVIVAS-CASTILLO,
3) MIDLAND AGUASVIVAS-CASTILLO,
4) SUMAYA AGUASVIVAS-CASTILLO,
5) PORFIRIO ALEXIA CASTILLO-TEJADA,
6) MYRNA SIARES-LACEN,
7) GRISELLE VAZQUEZ-VILLALONGO,
8) MARGARITA APONTE-CRUZ,
9) AIDA PEREZ-MEDINA,
10) SONIA MARTINEZ-ENCARNACION,
11) MARIE PEREZ-ROSA,
12) ANA RIVERA-RODRIGUEZ,
13) LUZ MASSA-VAZQUEZ,
14) DIANA RAMOS-PEDROZA,

Defendants

# O R D E R

Before the Court are the Objections to the Pre-Sentence Investigation Report and a Request for Downward Departure and Variance filed by defendant Bepsy O. Aguasvivas-Castillo on February 23, 2009 (docket entry 403) and the Response in Opposition filed by the United States on April 3, 2009 (docket entry 422). Defendant has challenged three upward adjustments[1] applied to him under the advisory Sentencing Guidelines in the Pre-Sentence Report (PSR), seeks correction of some factual information which he claims was incorrectly reported, and pleads for both a downward departure and/or a variance from the applicable Guideline Sentencing Range (GSR). The United States has opposed most of these requests. We now address defendant's contentions.

_____

[1] Actually, his motion contains four such challenges, but one (to the application of a two (2) level increase pursuant to U.S.S.G. §2S1.1(b)(2)(B)), has been rendered moot as it was not included in the PSR filed with the Court.

CRIMINAL 07-0111CCC                    2

**Objections to upward adjustments under the Sentencing Guidelines**.

The PSR calculated the Sentencing Guidelines applicable to defendant as follows: it initially established that defendant had a base offense level of 8 pursuant to U.S.S.G. §2S1.1(a)(2), to which it added twenty (20) levels under U.S.S.G. §2B1.1 after concluding that "the fraud was more than $7,000,000." PSR, at p. 7, ¶ 21. Four (4) additional levels were added under U.S.S.G. §2S1.1(b)(2)(C) based on the finding that defendant "was in the business of laundering funds." PSR, at p. 7, ¶ 22. Another four (4) levels were applied pursuant to U.S.S.G. §3B1.1(a) for defendant being an "organizer or leader" in an offense that "involved five or more participants or was otherwise extensive." Defendant has objected all these upward adjustments.

We turn first to defendant's objection to the calculation of his base offense level. Under U.S.S.G. §2S1.1(a)(2), said calculation depends on the total value of the "laundered funds." The U.S. Probation Officer concluded that those funds exceeded $7,000,000, so to the nadir base offense level of eight (8) it added twenty (20) levels under the table in §2B1.1. Defendant, however, claims that the laundered funds were not more than $334,493.00, meriting only a twelve (12) level increase (and not twenty (20)) to his base offense level under U.S.S.G. §2B1.1.[2] Defendant reaches this amount through a rather convoluted computation: he starts by stating the total amount of money cashed by the three Aguasvivas supermarkets during the conspiracy time span ($2,340,522.12), deducts from it the amount allegedly legally provided in cash to PAN participants under their 25% cash allowance ($668,035.09), and further reduces it by the amount he speculates was used by the three stores as petty cash, to pay suppliers, and to cash checks of its employees and customers ($334,497.00). From the remainder amount ($1,337,990.03), he then calculates the 22.5%

---

[2] Defendant filed a Supplement to Objections on February 15, 2010 (docket entry 452), where he avers a new theory to determine the total amount of the "loss." Said theory, however, is premised on the application of Guideline §2B1.1 as if it were the one governing this offense, but it is not. The PSR correctly determined that the guideline applicable to defendant's offense is §2S1.1. As mentioned above, the table in §2B1.1(b)(1) only applies collaterally, pursuant to §2S1.1(a)(2), in order to assign an increase in the offense level to reflect the value of the laundered funds.

CRIMINAL 07-0111CCC                    3

"allegedly received as kickback," Motion, at p. 3, and claims that the result, $334,493.00, constitutes the value of the laundered funds to be considered for purposes of the §2B1.1 calculation.

Application Note 1 to U.S.S.G. §2S1.1 defines "laundered funds" as "the property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. §1956 or §1957." Thus, in this case the laundered funds were all those obtained throughout the conspiracy in violation of the PAN regulations, when the PAN beneficiaries were provided cash in excess of the 25% allowance permitted by that program's regulations by passing off those illegal cash transactions as "legitimate" grocery purchases, and which funds were then deposited through electronic benefit transfer transactions ("EBT") to various bank accounts which defendant controlled. While the laundered funds include the total amount received as kickbacks for the illegal cash-outs provided to the PAN beneficiaries, they are not limited to it as defendant posits.

What was the exact total amount of the illegal cash transactions that were disguised as valid grocery purchases is almost impossible to determine, as the testimony at trial of Special Agent Andrew John Toth established that from the records of the transactions it could not be established which of the PAN transactions at the three Aguasvivas supermarkets property of defendant were for actual food purchases and which did not involve actual food purchases but were recorded as such. However, there is an important piece of evidence that is of much help in the assessment of a portion of that amount: S.A. Toth's analysis of all food purchase transactions over $75.00 that occurred within sixty (60) seconds of a preceding food purchase transaction in all three Aguasvivas supermarkets during the duration of the conspiracy. S.A. Toth explained that such a task--processing a food purchase transaction of more than $75.00 within sixty (60) seconds of the preceding one--was impossible at all three stores given that the cash registers then in use lacked electronic scanners or bar coding mechanisms so that each individual item purchased and its price had to be manually entered by the cashiers, a time-consuming chore by itself, to

CRIMINAL 07-0111CCC                    4

which they had to factor in the additional time it took the consumer to swipe the card, enter the PIN number, make the appropriate selection for the transaction desired, await for its approval and obtain the printed receipt.[3] Thus, all of these transactions were obviously fake food purchases used to legitimize the illegal cash transactions.  During the period from January 1, 2002 through June 30, 2006, within the span of the conspiracy, there were 29,486 separate instances where a food purchase transaction of more than $75.00 occurred within sixty (60) seconds of the previous food purchase transaction.  The total value of those 29,486 transactions was $4,440,744.29.  Thus, this sum constitutes the minimum amount of laundered funds involved in this offense.  The Court is keenly aware that the total amount of money laundered by defendant through his illegal scheme was probably a lot more, but given the impossibility to distinguish between the legitimate and illegitimate food purchases and the particular definition of laundered funds applicable to the guideline section at issue,[4] it will use this number to determine defendant's base offense level under U.S.S.G. §2S1.1(a)(2).  Accordingly, under the table in U.S.S.G. §2B1.1(b)(1)(J), the $4,440,744.29 translates into eighteen (18) additional levels to the otherwise basic base offense level of eight (8), for an adjusted base offense level of twenty-six (26) under U.S.S.G. §2S1.1(a)(2).  Consequently, defendant's objection is OVERRULED, but the Court ORDERS that the PSR be amended to reflect the corrected base offense level just determined above.

Defendant next objects the four (4) level upward adjustment applied under §2S1.1(b)(2)(C) for being in the business of laundering funds.  Without developing his

---

[3] Trial transcript of August 6, 2008, direct examination of S.A. Toth, pp. 24, line 8, through 26, line 14.

[4] In its Opposition (docket entry 422), the government proposes that precisely because the legal and illegal transactions executed under the PAN program at the three supermarkets during the duration of the conspiracy could not be distinguished, the entire amount of those transactions, which exceeded $20,000,000.00, be considered as laundered funds.  In support of its request, the government cites a series of cases which establish that for purposes of forfeiture, the commingling of legitimate funds with illegally-obtained funds taints the entire amount, thereby making all of it forfeitable.  However, sources of authority interpreting in similar fashion the relevant Guideline section have not been provided by the government.

CRIMINAL 07-0111CCC                    5

challenge, he merely asserts, in conclusory fashion, that he "was not in the business of laundering funds under the totality of circumstances," apparently making reference to Application Note 4(A) to §2S1.1 which  indicates that "[t]he court shall consider the totality of the circumstances to determine whether a defendant who did not commit the underlying offense was in the business of laundering funds."  Application Note 4(B), however, provides a non-exhaustive list of factors to be considered by the courts in their assessment, among them, if the defendant "engaged in laundering funds during an extended period of time," "from multiple sources," and "generated a substantial amount of revenue in return for laundering funds."  As the government correctly points out in its opposition, defendant engaged in this money laundering venture for a period of slightly more than four (4) years, and, even if we were to consider that his money laundering activities produced only the sum of $334,493.00 in kickbacks, which he is willing to acknowledge (see defendant's Objections, at p. 3), this certainly constitutes a substantial amount of revenue.  We must add to that the multiple sources from which he laundered funds: countless PAN beneficiaries during the entire duration of the conspiracy.  The totality of the circumstances, thus, establish the he was clearly engaged in the business of laundering funds.  His objection to the contrary is OVERRULED.

The last objection to the upward adjustments raised by defendant pertains to the four (4) level increase to his base offense level applied under Guideline §3B1.1(a) for being an organizer or leader in an offense which involved five or more participants or was otherwise extensive.   Again, no argument is provided in support of this objection.   This is understandable since his claim is vapid.  The trial evidence abundantly established that the conspiracy involved the required number of participants to trigger this adjustment, among them three of his siblings and his brother-in-law, and also that defendant exercised a supervisory role over them in their joint criminal venture.  The objection to the upward adjustment under  §3B1.1(a) is also OVERRULED.

Accordingly, based on a total offense level of 34 and a Criminal History Category of I, defendant's advisory GSR is 151 to 188 months.

CRIMINAL 07-0111CCC                           6

**Correction to factual information.**

Defendant challenges the PSR's finding that the proceeds of the fraudulent conduct for which he was convicted amounted to $20,000,000.00.  He makes reference to a section of the PSR where the U.S. Probation Officer stated: "On October 29, 2008, the Court determined that the defendant Bepsy O. Aguasvivas-Castillo shall forfeit to the United States the amount of $20,000,000.00 which is the proceeds traceable to the conspiracy to commit food stamps fraud and the money laundered."  See PSR at p. 5, ¶ 12.  The U.S. Probation Officer merely restated in the PSR what the Court found in its Order (docket entry 377), and the information provided by her in relation to that Order was factually correct.  Accordingly, that objection is OVERRULED.

Defendant's additional factual objections, to ¶¶ 39, 40 and 43 of PSR, appear to have been incorporated in the PSR filed with the Court and are, therefore, MOOT.

Finally, defendant avers having provided all financial forms and supporting documents  required by the U.S. Probation Officer, which the Court notes.  He claims being indigent and unable to pay a fine.  The government, in its opposition, has questioned the veracity of the information provided.   We will weigh all the information provided in determining whether the imposition of a fine is warranted and, if so, its amount.


**Request for a downward departure and/or a variance.**

Defendant has also included in its Sentencing Memorandum a request for a downward departure and/or variance from the applicable GSR.  We have considered all the arguments raised by defendant in support of both requests, as we must.  Suffice it to say at this time that the sentence to be imposed will take into account all the statutory sentencing factors established in 18 U.S.C. §3553(a).

SO ORDERED.

At San Juan, Puerto Rico, on March 5, 2010.


                                        S/CARMEN CONSUELO CEREZO
                                        United States District Judge